**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ALICIA BROWN, individually          *
and on behalf of all others         *
similarly situated who consent to their   *
inclusion in a collective action,   *
                                    *
            Plaintiffs,             *
                                    *
        v.                          *          1:17-CV-01679-ELR
                                    *
NEXUS BUSINESS SOLUTIONS,           *
LLC,                                *
                                    *
            Defendant.              *
                                    *

_____

**O R D E R**

_____

There are several matters pending before the Court.  The Court's reasoning

and conclusions are set forth below.

I.      **Background**[1]

This case stems from Defendant Nexus Business Solutions, LLC's ("Nexus")

alleged violations of the Fair Labor Standards Act ("FLSA") by its purported failure

---

[1] All facts noted herein are undisputed unless otherwise indicated.

to pay earned overtime wages to Plaintiff Alicia Brown and the putative class of others similarly situated.[2]  See Compl. [Doc. 1].

The Court draws the material facts from the Parties' submissions (including exhibits).  In support of its Motion for Summary Judgment, Defendant, as movant, filed a Statement of Undisputed Material Facts ("Def.'s SOMF").  [Doc. 232-2]; see also LR 56.1(B)(1), NDGa.  As required by Local Rule 56.1(B)(2)(a), Plaintiffs submitted a response ("Pls.' Resp. to Def.'s SOMF").  [Doc. 251]; see also LR 56.1(B)(2)(a), NDGa.  Plaintiffs, as cross-movants, also filed a Statement of Undisputed Material Facts ("Pls.' SOMF") in support of their Motion for Summary Judgment.  [Doc. 247-2].  Defendant submitted its response as required by the Local Rules ("Def.'s Resp. to Pls.' SOMF").  [Doc. 257].

The Court uses the Parties' proposed facts and responses as follows.  Where one side admits a proposed fact, the Court accepts it as undisputed for purposes of this order and cites only the proposed fact.  Where one side admits a proposed fact in part, the Court includes the undisputed part.  Where one side denies a proposed fact in whole or in part, and such fact is material, the Court reviews the record and

---

[2] The Parties' documents in this case vacillate between using the singular and plural form of "Plaintiff."  For the sake of simplicity, and because this case was conditionally certified as a collective action pursuant to Section 216(b) of the Fair Labor Standards Act [Doc. 44], the Court will use the plural "Plaintiffs" throughout this order except when specifically discussing an individual opt-in Plaintiff.

determines whether a factual dispute exists.[3]  If the denial is without merit, and the record citation supports the proposed fact, then the Court deems it admitted.  Given Plaintiffs' penchant for making arguments in their proposed facts, the Court has often been forced to modify their Statement of Material Facts to more accurately reflect the record cited.  Finally, the Court excludes proposed facts that are immaterial, see LR 56.1(B)(2)(a)(2)(iii), NDGa., includes facts drawn from its review of the record, see FED. R. CIV. P. 56(c)(3), and considers all proposed facts in light of the standards for summary judgment.[4]

Plaintiffs worked as Business Development Managers ("BDMs") for Defendant.  Pls.' SOMF ¶ 46.  During Plaintiffs' employ, as early as January 2014, Defendant's primary focus was a project called "Operation Conquest," a contractual endeavor with automobile manufacturer General Motors ("GM").[5]  Id. ¶¶ 1, 5, 45; Def.'s SOMF ¶¶ 1–2, 8.  Defendant derives substantially all its revenue from this contract with GM.  Def.'s SOMF ¶ 12; Pls.' SOMF ¶ 39.

---

[3] The Court only reviews the citations provided by the Parties as to where the disputed fact lies. The Court is not obligated to "scour the record" to determine whether triable issues exist.  Tomasini v. Mt. Sinai Med. Ctr. of Fla., 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004).

[4] Although the Court has endeavored to deal with all objections, given the extensive number of them, the inclusion of a proposed fact with no discussion of the objection means that it been considered, but overruled.

[5] According to Plaintiffs, GM is Defendant's sole client in the U.S. and all of Defendant's revenue is "derived from per-head staffing of BDMs . . . related to Operation Conquest[.]"  Pls.' SOMF ¶ 39.

Pursuant to Operation Conquest, GM engaged Defendant to provide a certain number of BDMs (including Plaintiffs) to "hunt and conquest" commercial businesses that use fleets of vehicles as part of their operations.  Pls.' SOMF ¶¶ 8, 38, 40; Def.'s Resp. to Pls.' SOMF ¶¶ 8, 38, 40.  These BDMs would meet with the targeted businesses in hopes of convincing them to purchase GM vehicles for their fleets from GM dealers.  Pls.' SOMF ¶¶ 8–9; Def.'s Resp. to Pls.' SOMF ¶¶ 8–9.  Allegedly, GM recognized the need for this type of outside consultant-like role because dealership representatives cannot leave the dealership to solicit sales from potential fleet customers.  Def.'s SOMF ¶ 5; Pls' Resp. to Def's SOMF ¶ 5.

Defendant trained Plaintiffs to deliver presentations aimed at promoting the GM brand with the goal of persuading the potential customers to purchase GM fleets, although Plaintiffs themselves could not actually execute a sale—that final step had to be done by a GM dealer.  Def.'s SOMF ¶¶ 10, 14; Pls.' SOMF ¶¶ 9, 11, 13, 22, 27.  While Plaintiffs received specific training on how to execute their pitches and the ideal process to get a potential customer to a GM dealership, they also possessed discretion to determine how they spent their workdays.  Pls.' SOMF ¶¶ 51–53; Def.'s Resp. to Pls.' SOMF ¶¶ 51–53; Def.'s SOMF ¶¶ 25–28, 30, 32, 45, 67–69; Pls.' Resp. to Def.'s SOMF ¶ 25.  For example, Plaintiffs frequently performed their own research to customize their presentations to suit different potential customers' needs.  Pls.' SOMF ¶ 63; Def.'s SOMF ¶¶ 29, 31, 33–38; Pls.' Resp. to Def.'s SOMF ¶ 31.

As part of their role as BDMs, Plaintiffs would follow up with leads, sometimes meeting more than once, working to convince the lead to meet with a GM dealer. Def.'s SOMF ¶¶ 41, 48; Pls.' SOMF ¶¶ 74, 77, 93.  All of the vehicles sold through Operation Conquest were the property of GM dealers.  Pls.' SOMF ¶ 80.

Plaintiffs worked out of their home offices or on the road, meeting with commercial businesses on-site, earning a base salary of $70,000–$75,000 (plus quarterly bonuses if they qualified).   Def.'s SOMF ¶¶ 18–19; Pls.' SOMF ¶¶ 48– 49.  BDMs used company vehicles provided by Defendant for their travel.  Def.'s SOMF ¶ 24.  Plaintiffs contend they regularly worked in excess of forty (40) hours per week, although Defendant argues Plaintiffs lack any evidence that they worked overtime.  Pls.' SOMF ¶¶ 24, 97; Def.'s SOMF ¶¶ 88–91.  While the employment offer letters from Defendant said that Plaintiffs may be expected to work in excess of their regular 8:00 a.m.– 5:00 p.m., Monday–Friday schedule, the letters also stated that Plaintiffs would not receive overtime pay because they would be considered exempt employees.  Pls.' SOMF ¶ 98; Def.'s SOMF ¶¶ 51–52.  However, Plaintiffs filed this lawsuit on the assertion that they should have been compensated for their overtime hours as non-exempt employees.  See generally Compl.

## II.   Procedural History

Plaintiffs filed their Complaint on May 10, 2017.  Id.  The Parties engaged in several lengthy discovery disputes, including a dispute regarding Defendant's expert

witness Robert Stanton.  As a result of the dispute regarding Mr. Stanton, Plaintiffs filed their "Motion for Leave of Court to File Supplemental Evidence in Support of Plaintiffs' Motion for Summary Judgment and Request for Leave to File Supplemental Brief in Opposition to Defendant's Motion for Summary Judgment and Support of Plaintiffs' Motion for Summary Judgment." [Doc. 287].  In response, Defendant filed a Request for Oral Argument.  [Doc. 291].

On October 3, 2019, both Parties filed their respective motions for summary judgment.  [Docs. 232, 233].  However, the Court ordered Plaintiffs to amend their motion because it did not comply with the applicable page limit.  [Doc. 241].  On October 11, 2019, Plaintiffs filed their Amended Motion for Summary Judgment.[6] [Doc. 247].  Subsequently, Plaintiffs submitted a "Motion *in Limine* to Exclude the Defendant's Use of Half Time 29 [C.F.R.] § 778.114, or Use of Fluctuating Workweek Method (FWW) to Determine Damages."  [Doc. 297].  Having been fully briefed, these motions are now ripe for the Court's review.[7]

---

[6] Plaintiffs' Amended Motion for Summary Judgment [Doc. 247] renders Plaintiffs' first motion for summary judgment moot.  Thus, the Court denies Plaintiff's original motion for summary judgment as moot.  [Doc. 233].

[7] Plaintiffs additionally filed two (2) motions to seal certain exhibits in this matter.  [Docs. 234, 252].  Upon due consideration, and for good cause shown, the Court grants Plaintiffs' motions.  [Docs. 234, 252].

### III.   Preliminary Matter: Plaintiffs' Motion for Leave to File Supplemental Evidence and Briefing

The Court first addresses the issue of what expert testimony will be considered in the assessment of the Parties' motions for summary judgment.  On July 13, 2020, Plaintiffs filed their "Motion for Leave of Court to File Supplemental Evidence in Support of Plaintiffs' Motion for Summary Judgment and Request for Leave to File Supplemental Brief in Opposition to Defendant's Motion for Summary Judgment and Support of Plaintiffs' Motion for Summary Judgment."  [Doc. 287].  By this motion, Plaintiffs seek leave to submit the deposition transcript of Defendant's expert witness Robert Stanton, as well as the expert report of Plaintiffs' recently added rebuttal expert, Jorge J. Rivero.  [Id. at 1–2].  Additionally, Plaintiffs request "leave to file a supplemental brief in opposition to Defendant's motion for summary judgment, and in support of Plaintiffs' motion for summary judgment[.]"  [Id. at 6].  Plaintiffs contend summary judgment is not ripe until the materials of their rebuttal expert are considered by the Court.  [Id. at 2–3].

Earlier in this litigation, Plaintiffs moved to strike Mr. Stanton as an expert (or, in the alternative, to file a motion *in limine* to exclude his opinion) due to Defendant's late disclosure of him as an expert.[8]  [See Doc. 212].  However, the

---

[8] Defendant filed a designation of Robert Stanton as an expert witness together with his expert report on the final day of discovery, August 20, 2019.  [Doc. 209].  According to Defendant, Mr. Stanton's designation was filed "when it became clear that the parties would not be able to settle this case prior to filing summary judgment."  [Doc. 288 at 2].

Court found Defendant's late disclosure to be justified.  [Docs. 237 at 3; 267].  While the Court allowed Defendant to include Mr. Stanton as an expert, it also extended the discovery period by ninety (90) days for the limited purpose of allowing Plaintiffs to "obtain[] one (1) rebuttal expert witness and to depose Defendant's expert witness."  [Doc. 277 at 6].  Plaintiffs deposed Defendant's expert Mr. Stanton on June 4, 2020, and now present Mr. Rivera as their rebuttal expert witness.  [Doc. 287 at 4].  Thus, Plaintiffs request the Court's leave to file additional materials and briefing before the Court rules on the Parties' motions for summary judgment.  [See generally id.]

However, on July 21, 2020, Defendant filed a "Notice of Withdrawal of Reference in Summary Judgment Briefing to Expert Report by Robert Stanton." [Doc. 288].  Defendant contends that it made a good faith offer to Plaintiffs' counsel to withdraw any reference to Mr. Stanton "so the parties could avoid the issue of reopening summary judgment at this late stage."  [Id. at 3–4].  But rather than accept the offer, Defendant claims Plaintiffs elected to file their instant motion to amend their summary judgment briefs with their additional materials.  [Id.]  Hoping to avoid "relitigating summary judgment nearly ten months after the [P]arties have completed briefing[,]" Defendant filed its notice to "voluntarily withdraw the single reference to Mr. Stanton's expert report in both its motion for summary judgment and the accompanying statement of undisputed material facts."  [Id. at 4].

The Court has broad discretion in deciding whether to grant Plaintiffs' motion. E.g., Johnson v. Bd. of Regents of Univ. of Georgia, 263 F.3d 1234, 1269 (11th Cir. 2001) ("[D]istrict courts [have] broad discretion over the management of pre-trial activities[.]"); Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1366 (11th Cir. 1997) ("[D]istrict courts enjoy broad discretion in deciding how best to manage the cases before them.").  Because Defendant has voluntarily withdrawn its references to Mr. Stanton's expert report in its summary judgment materials, the Court finds it unnecessary to reopen summary judgment briefing so that Plaintiffs may submit their rebuttal expert materials from Mr. Rivera and their new arguments based on their deposition of Mr. Stanton.   Rather, the Court will decide the Parties' cross-motions for summary judgment without considering any references to Defendant's expert or his report, eliminating the need to consider any rebuttal expert materials.  Accordingly, the Court denies Plaintiffs' "Motion for Leave of Court to File Supplemental Evidence in Support of Plaintiffs' Motion for Summary Judgment and Request for Leave to File Supplemental Brief in Opposition to Defendant's Motion for Summary Judgment and Support of Plaintiffs' Motion for Summary Judgment." [Doc. 287].[9]

---

[9] In light of this ruling, the Court also denies Defendant's Request for Oral Argument regarding Plaintiffs' motion.  [Doc. 291].

## IV.   The Parties' Motions for Summary Judgment

The Court now proceeds to its analysis of the Parties' cross-motions for summary judgment.  [Docs. 232, 247].  Before turning to the Parties' contentions, the Court sets forth the relevant legal standard.

### A.    Legal Standard

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." GEBAM, Inc. v. Inv. Realty Series I, LLC, 15 F. Supp. 3d 1311, 1315–16 (N.D. Ga. 2013) (citing Am. Bankers Ins. Grp. v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005)); see United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed.") (internal quotation omitted).  The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration.  U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc., 972 F. Supp. 2d 1339, 1341 (N.D. Ga. 2013).  Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement

by the parties as to the controlling legal theories and material facts. Id. at 1341; accord Oakley, 744 F.2d at 1555–56.

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome under the governing law. Id. A party's motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. Id. at 249.

When ruling on a party's motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that a genuine issue for trial

remains.  Id. at 324–26.  The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251–52.  However, the Court is not obligated to "scour the record" to determine whether triable issues exist.  Tomasini, 315 F. Supp. 2d at 1260 n.11.

### B.    The Parties' Contentions

Having laid out the relevant legal standard, the Court now turns to address the substance of the Parties' arguments.  In their cross-motions for summary judgment, the Parties raise two (2) main issues for the Court's consideration.  [Docs. 232, 247].  First, the Parties dispute whether sufficient evidence exists to support Plaintiffs' claim that they worked overtime hours.  [See, e.g., Docs. 232-1 at 6–8; 260 at 14–15].  Second, the Parties dispute whether Plaintiffs were exempt employees pursuant to any of three (3) FLSA exemptions: the outside sales exemption, the auto sales and service exemption, and/or the administrative exemption.  [See, e.g., Docs. 232-1 at 8–32; 247-1 at 5–34].  After providing an overview of the FLSA, the Court addresses these issues in turn.

### 1.    The FLSA

The FLSA requires employers to pay employees an overtime rate if they work more than forty (40) hours in a week, unless the employees qualify as exempt pursuant to one of its many exemptions.  See 29 U.S.C. §§ 207(a)(1), 213.  "[A]n

employer can avoid paying overtime compensation if it proves that one of the FLSA's exemptions applies." Kessler v. Lifesafer Serv. Providers, LLC, 545 F. Supp. 2d 1244, 1246 (M.D. Fla. 2008) (citing Wouters v. Martin County, Fla., 9 F.3d 924, 929 (11th Cir.1993), cert. denied, 513 U.S. 812 (1994)); see also 29 U.S.C. § 213. "FLSA provisions are to be interpreted liberally in the employee's favor and its exemptions construed narrowly against the employer." Rock v. Ray Anthony Int'l, 380 F. App'x 875, 877 (11th Cir. 2010) (citing Birdwell v. City of Gadsden, 970 F.2d 802, 805 (11th Cir. 1992)); accord Alvarez Perez v. Sanford–Orlando Kennel Club, Inc., 515 F.3d 1150, 1156 (11th Cir. 2008) (same); Contreras v. Lara's Trucks, Inc., 1:12-CV-85-TWT, 2013 WL 163648, at *2 (N.D. Ga. Jan. 14, 2013) (same).

"The employer bears the burden of proving that an employee is exempt from overtime payments." Rock, 380 F. App'x at 877 (citing Atlanta Prof'l Firefighters Union, Local 134 v. City of Atlanta, 920 F.2d 800, 804 (11th Cir. 1991)); see also Alvarez Perez, 515 F.3d at 1156 ("[T]he employer shoulders the burden of establishing that it is entitled to an exemption[.]"). For Defendant to prevail, it must prove the applicability of the exemption by "clear and affirmative evidence." Sigida v. Munroe Foods 2 LLC, 1:14-CV-3968-RWS, 2016 WL 7239952, at *3 (N.D. Ga. Dec. 15, 2016) (quoting Birdwell, 970 F.2d at 805) (internal quotation marks removed). Exemptions require highly fact-intensive analyses because "an

employee's exemption from overtime depends only upon that employee's job duties," not the employee's job title.  Ehrlich v. Rich Prods. Corp., 767 F. App'x 845, 850 n.3 (11th Cir. 2019) (internal citation omitted); see also Contreras, 2013 WL 163648, at *3 ("[T]he label that the parties place on the employee's duties does not alter the analysis of what those duties were; the primary duty inquiry is still required[.]").

Nevertheless, the federal agency tasked with regulating the FLSA—the U.S. Department of Labor (the "DOL")[10]—recently noted,

> [t]he Supreme Court has held that exemptions under the FLSA deserve a "fair (rather than a narrow) interpretation" because the exemptions are "as much a part of the FLSA's purpose as the overtime-pay requirement."  Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1142 (2018) (internal quotation marks and citation omitted).  "And that is as should be expected, because employees' rights are not the only ones at issue and, in fact, are not always separate from and at odds with their employers' interests."  Sec'y U.S. Dep't of Labor v. Bristol Excavating, Inc., 935 F.3d 122, 135 (3d Cir. 2019)[.]

U.S. Dep't of Labor, Wage & Hour Div., FLSA 2020-10 Opinion Letter (June 25, 2020).

In the instant matter, Defendant argues that Plaintiffs fall under three (3) exemptions of the FLSA.[11]  But Defendant first disputes the fundamental premise of

---

[10] See Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 147 (2012) (Congress delegated authority to the DOL to issue regulations defining the terms of the FLSA).

[11] The three (3) exemptions Defendant asserts as applicable to Plaintiffs are: (1) the outside sales exemption [Doc. 232-1 at 8–15]; (2) the motor vehicle sale exemption [id. at 15–27]; and/or (3) the administrative exception.  [Id. at 27–32].

Plaintiffs' case—namely, Defendant claims Plaintiffs cannot show they worked overtime hours.  [Doc. 232-1 at 6–32].  The Court addresses the Parties' dispute regarding Plaintiffs' alleged overtime hours before turning to its analysis of the three (3) FLSA exemptions Defendant propounds as applicable to Plaintiffs.

        2.    Plaintiffs' Alleged Overtime Hours

        As an initial matter, Defendant moves for summary judgment on the basis that that Plaintiffs fail to establish the two (2) basic elements of a prima facie FLSA claim: that "(1) an employee worked unpaid overtime, and (2) the employer knew or should have known of the overtime work."  Bailey v. TitleMax of Georgia, Inc., 776 F.3d 797, 801 (11th Cir. 2015) (citing Allen v. Bd. of Pub. Educ. for Bibb Cty., 495 F.3d 1306, 1314–15 (11th Cir. 2007)).  The Court addresses these elements in turn.

        a.    Evidence of Unpaid Overtime

        As to the first element, Plaintiffs bear the initial burden of establishing that they worked unpaid overtime.  Allen, 495 F.3d at 1315.  However, such a burden should not become an "impossible hurdle for the employee[s] . . . ."  Id. (internal quotation omitted).  Rather, "[t]he employer is in a superior position to know and produce the most probative facts concerning the nature and amount of work performed."  Id.  Indeed, "[i]t is the employer's duty to keep records of the employee's wages, hours, and other conditions and practices of employment."

Id.  Because employees are subject to the control of their employers, the remedial nature of the FLSA provides protection for employees by lessening the burden of proof where an employer has failed to maintain accurate and adequate records.  Id. at 1315–16.

Thus, in the absence of adequate time records from the employer, employees bear a relaxed burden of proof, which they may satisfy with evidence that allows a "just and reasonable inference" of the "amount and extent" of their alleged unpaid overtime work.  See Jackson v. Corr. Corp. of Am., 606 F. App'x 945, 952 (11th Cir. 2015); see also Lamonica v. Safe Hurricane Shutters, Inc., 711, F.3d 1299, 1315 (11th Cir. 2013) (an employee's burden is relaxed where the employer failed to keep time records); Estrada v. FTS USA, LLC, 1:14-CV-23388-KMM, 2016 WL 6157989, at *3 (S.D. Fla. Oct. 24, 2016), aff'd, 688 F. App'x 830 (11th Cir. 2017) (when an employer's records of hours and compensation paid to employees are inaccurate or inadequate, the employees' burden of proof is "relaxed") (citing Allen, 495 F.3d at 1316).

If the employees meet their relaxed burden to prove the first element—that they worked unpaid overtime hours—the burden then shifts to the employer "to produce evidence of the precise amount of work performed or to negate the reasonableness of the inference to be drawn from the employee[s'] evidence." Solano v. A Navas Party Prod., Inc., 728 F. Supp. 2d 1334, 1343 (S.D. Fla. 2010)

(internal quotation omitted).   Summary judgment should not be granted to a defendant employer where "a reasonable fact finder evaluating the evidence could draw more than one inference from the facts" presented regarding the number of hours worked by employees.   See Allen, 495 F.3d at 1315 (citing Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)).

As noted above, Defendant moves for summary judgment on the basis that Plaintiffs fail to identify any evidence that they worked in excess of forty (40) hours per week such that they could potentially qualify for overtime pay pursuant to the FLSA.  [Doc. 232-1 at 6–8].  Plaintiffs counter with evidence of their overtime work through their own depositions; declarations; and time-stamped records of phone calls, emails, and database entry activity occurring outside their regular 8:00 a.m.–5:00 p.m., Monday through Friday schedule.  Pls.' Resp. to Def.'s SOMF ¶ 91 (citing exhibits); [see also Doc. 260 at 15].

As the non-moving Party on this issue, the Court must view all evidence in the record on this topic in the light most favorable to Plaintiffs.  See Reeves, 530 U.S. at 150.  Pursuant to this standard, the Court finds Plaintiffs' evidence "allows a just a reasonable inference" that Plaintiffs worked more than forty (40) hours per week.  See Estrada, 2016 WL 6157989, at *3 (citing Allen, 495 F.3d at 1316).

Because Plaintiffs bear their burden to establish the first element of a prima facie FLSA claim, the burden then shifts to Defendant employer "to produce

evidence of the precise amount of work performed or to negate the reasonableness of the inference to be drawn from the employee's evidence." Solano, 728 F. Supp. 2d at 1343.  Here, Defendant has neither produced evidence of the precise amount of work performed nor presented any evidence to negate the reasonableness of the inference presented by Plaintiffs' evidence—that Plaintiffs sometimes worked more than forty (40) hours per week.  See Allen, 495 F.3d at 1316.  Defendant effectively concedes the lack of "documentary evidence" of Plaintiffs' exact hours worked; thus, that it cannot meet its burden to "produce evidence of the precise amount of work performed."  See Solano, 728 F. Supp. 2d at 1343; [see also Docs. 232-1 at 8; 258 at 19].  Plaintiffs additionally point to the deposition testimony of Defendant's corporate representative, Ms. Colleen Tatro, where she stated that Defendant did not track the hours worked by BDMs.  Pls.' Resp. to Def.'s SOMF ¶ 85; [Doc. 260 at 15].  Indeed, Ms. Tatro[12] stated in her deposition that the company has "no information to dispute the Plaintiff's [sic] claims that they routinely worked more than 40 hours" per week because "the company has no information at all" regarding how many hours Plaintiffs and other BDMs worked in any given week.  Pls.' Resp. to Def.'s SOMF ¶ 85; [Doc. 247-1 at 7].

---

[12] The Court notes that Plaintiffs use inconsistent labels when referencing the testimony of Colleen Tatro.  [See Doc. 247-1 at 35] (within the same paragraph, Plaintiff sometimes cites to "Corp. Rep. Dep." when discussing to Ms. Tatro's deposition testimony, and at other times cites to "Tatro Dep.").  However, the Court finds that any potential confusion created by Plaintiffs' inconsistent labels of Ms. Tatro's deposition does not impair the Court's analysis of the Parties' arguments in their motions for summary judgment.

Accordingly, Plaintiffs satisfy the first element of the two (2)-part test because the Court finds their evidence "allows a just a reasonable inference" that they sometimes worked more than forty (40) hours per week.  See Estrada, 2016 WL 6157989, at *3 (citing Allen, 495 F.3d at 1316).  This finding is particularly justified because Defendant does not meet its burden to provide rebuttal evidence.  While a genuine issue of material fact may remain as to the exact amount of uncompensated overtime hours Plaintiffs worked, that does not warrant summary judgment in Defendant's favor.  See Solano, 728 F. Supp. 2d at 1344 ("Whether 70 hours a week is a reasonable inference to draw from the evidence is not a determination for the Court, rather it is the duty of the trier of facts to draw whatever reasonable inferences can be drawn from the employees' evidence . . . . The determination of exactly how many hours Plaintiff was improperly compensated is therefore a question of fact appropriate for a jury.") (internal quotation omitted); see also Brantley v. Ferrell Elec., Inc., No. CV 114-022, 2015 WL 3541552, at *16 (S.D. Ga. May 29, 2015) (denying defendant's motion for summary judgment even where the plaintiffs testified that they did not record their time sheets, and therefore were not compensated for, various tasks including morning preparations and travel).

       *b.*    *Evidence the Employer Knew or Should Have Known of the Employees' Overtime Work*

The Court now addresses the second prong of a prima facie FLSA case—that the employer knew or should have known its employees worked overtime.

See Bailey, 776 F.3d at 801.   Plaintiffs present some evidence to suggest Defendant's awareness of their overtime work, or that Defendant at least contemplated that BDMs would work overtime, because language addressing overtime work was included in Plaintiffs' job offer letters.   See Pls.' SOMF ¶ 98 (citing to Plaintiffs' Ex. 6, labeled "Composite Offer Letters").   Plaintiffs point to two (2) examples of job offer letters from Defendant that both state there "may" be times overtime work will be required "due to the nature of [the BDM] position," but that no extra payment would be made for these hours.   Id.   Defendant responds that "[t]his in no way proves that Nexus knew of any instance in which a BDM actually worked over 40 hours per week" because the word "may" only refers to the possibility, not the certainty, of anticipated overtime work.   Def.'s Resp. to Pls.' SOMF ¶ 98.   The Court finds Defendant's argument on this point to be unpersuasive because the same offer letters state that Plaintiffs would be considered "non-exempt employees" despite the potential overtime; thus, it appears to the Court that Defendant clearly considered what would happen in the event Plaintiffs worked more than forty (40) hours a week.   See Pls.' Ex. 6.

For the foregoing reasons, the Court finds that Plaintiffs have sufficiently pled the two (2) elements of a prima facie FLSA claim, and Defendant's arguments to the contrary do not merit summary judgment in Defendant's favor on this point. Construing all evidence in favor of Plaintiffs, as the non-moving party on this issue,

a reasonable jury could find that Plaintiffs worked overtime hours and that Defendant knew or should have known of the overtime work.  Accordingly, the Court now proceeds with its analysis of the three (3) exemptions Defendant claims should preclude Plaintiffs from overtime pay, despite any unpaid overtime hours Plaintiffs worked.

3. Exemptions to the FLSA

Despite the Court's finding regarding the number of hours Plaintiffs worked, summary judgment in favor of Defendant is nevertheless appropriate if Plaintiffs fall within one of the many exemptions to FLSA.  See Kessler, 545 F. Supp. 2d at 1246. Thus, the Court turns to the three (3) FLSA exemptions Defendant claims should apply to Plaintiffs.   Defendant argues that Plaintiffs are not entitled to overtime pay because they were statutorily exempt employees according to the (1) outside sales, (2) motor vehicle sales, and/or (3) administrative exemptions of the FLSA. [Doc. 232-1 at 8–32].    However, Plaintiffs disagree and move for summary judgment on the basis that none of these exemptions apply to them.  [Doc. 247-1 at 5–35].  The Court addresses each exemption in turn.

a. *The Outside Sales Exemption*

First, the Court begins with the outside sales exemption.  The Parties vigorously dispute whether Plaintiffs' role as BDMs satisfies the definition of an outside sales employee, which would exempt Plaintiffs from the FLSA overtime pay

requirement.  Defendant (as the employer) has the burden of proving that Plaintiffs qualify for the outside sales exemption by clear and affirmative evidence. See Hogan v. Allstate Ins. Co., 361 F.3d 621, 625 (11th Cir. 2004); Birdwell, 970 F.2d at 805; Atlanta Prof'l Firefighters, 920 F.2d at 804; Sigida, 2016 WL 7239952, at *3.

The Department of Labor ("DOL") regulations define an outside sales employee as:

> any employee: (1) Whose primary duty is: (i) making sales within the meaning of section 3(k) of the [FLSA], **or** (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; **and** (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

Segraves v. AGCO, Inc., 1:17-CV-1997-TWT, 2018 WL 3772397, at *2 (N.D. Ga. Aug. 9, 2018), recons. denied, 2018 WL 6521478 (N.D. Ga. Oct. 11, 2018) (quoting 29 C.F.R. § 541.500) (emphasis added) (internal quotation marks omitted).  Thus, whether an employee falls under the outside sales exemption depends on two (2) factors: (1) the nature of the employee's primary duty; and (2) whether the employee regularly performs that primary duty away from the employer's place of business. See 29 C.F.R. § 541.500(a).  The Parties do not dispute the second factor, that Plaintiffs regularly conducted their jobs as BDMs away from Defendant's place of business.  [See Doc. 232-1 at 14]; see also Def.'s Exs. Q, R; Pls.' SOMF ¶¶ 59, 61.  Neither does Defendant argue that Plaintiffs qualify for this exemption under the

second type of "primary duty" defined by the statue: "obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer[.]" 29 C.F.R. § 541.500(a)(1)(ii).  Thus, the only factor for the Court to assess in determining whether this exemption applies to Plaintiffs is whether their "primary duty" as BDMs was "making sales within the meaning of section 3(k) of the [FLSA.]"  Id. § 541.500(a)(1)(i).

"The term 'primary duty' is defined at § 541.700."  Id. § 541.500(b).  Section 541.700(a) provides:

> [t]he term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

While the amount of time spent performing exempt work "can be a useful guide in determining whether exempt work is the primary duty of an employee," it is not "the sole test."  Id. § 541.700(b).  Regarding the primary duty of an outside sales employee, the DOL regulations additionally provide that

> work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as

exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.

Id. § 541.500(b).

As noted above, the outside sales exemption requires that the employee's primary duty comport with one (1) of two (2) options (in addition to the requirement that the employee generally performs the primary duty away from the employer's place of business). The primary duty asserted by Defendant here is that Plaintiffs "ma[de] sales within the meaning of section 3(k) of the [FLSA]."[13]   See id. § 541.500(a)(1)(i).   The DOL regulations further define this subsection by providing:

> [s]ales within the meaning of section 3(k) of the [FLSA] include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property.   Section 3(k) of the Act states that "sale" or "sell" includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.

Id. § 541.501(b). As the Supreme Court has instructed, "the catchall phrase 'other disposition' is most reasonably interpreted as including those arrangements that are

---

[13] See also Kuzinski v. Schering Corp., 604 F. Supp. 2d 385, 397 (D. Conn. 2009), aff'd, 384 F. App'x 17 (2d Cir. 2010) ("[T]he act of making a 'sale,' as that term is defined by the FLSA and DOL regulations, is a prerequisite to falling within the outside sales exemption[.]").

24

tantamount, in a particular industry, to a paradigmatic sale of a commodity."

Christopher, 567 U.S. at 164.[14]

Additionally, the DOL regulations distinguish promotion work from sales

work. See 29 C.F.R. § 541.503(a). As the Supreme Court also explained,

> the promotion-work regulation identifies promotion work as one type
> of activity often performed by persons who make sales, which may or
> may not be exempt outside sales work, depending upon the
> circumstances under which it is performed. § 541.503(a). Promotion
> work that is performed incidental to and in conjunction with an
> employee's own outside sales or solicitations is exempt work, whereas
> promotion work that is incidental to sales made, or to be made, by
> someone else is not exempt outside sales work. Ibid.

Christopher, 567 U.S. at 149 (alteration adopted) (internal quotation marks omitted).

With the relevant definitions of "primary duty" and "sales" in mind, the Court

now assesses whether Defendant has carried its burden to prove the applicability of

the outside sales exemption. Stevens v. SimplexGrinnell, LLP., 190 F. App'x 768,

771–72 (11th Cir. 2006) ("The employer has the burden to establish that the

employee is an outside salesman.") (citing Corning Glass Works v. Brennan, 417

U.S. 188, 196–97 (1974)); accord Rock, 380 F. App'x at 877.

In its motion, Defendant claims "Plaintiffs' primary duty as BDMs [was]

straight[-]forward"—"selling GM fleets to customers." [Doc. 232-1 at 11].

---

[14] Regarding 29 C.F.R. § 541.501(b), the Court also noted: "The specific list of transactions that
precedes the phrase 'other disposition' seems to us to represent an attempt to accommodate
industry-by-industry variations in methods of selling commodities. . . . Nothing in the remaining
regulations requires a narrower construction." Christopher, 567 U.S. at 164.

Defendant further argues that even though Plaintiffs never "sold" a GM vehicle in what one might consider the traditional sense, Plaintiffs still "made sales" within the meaning of the FLSA based on how courts have interpreted that phrase in varying situations. [See generally id. at 8–14]. The facts Defendant sets forth to support its argument include that: (1) Plaintiffs would solicit customers and "finalize a customer's commitment to purchase GM vehicles by directing the committed customer to a [GM] dealership" where the sale would be executed [id. at 11]; (2) Plaintiffs "were encouraged to collaborate with the [GM] dealers to present to customers" and "were expected to contribute to closing the sale" [id. at 12]; and (3) while Plaintiffs did not "execut[e] a sales agreement for GM fleet vehicles," they were "hired to cover a specific geographic sales territory and received incentive awards based on actual sales . . . generated from their solicitation of clients." [Id. at 13–14] (emphasis in original).

Moreover, Defendant contends that "[d]istrict courts throughout the country have enforced the outsides sales exemption . . . where a plaintiff was involved in the sale but did not execute the final sales agreement." [Id. at 13].   In its motion, Defendant asserts that Plaintiffs "spent the vast majority of their time soliciting prospective clients" for GM dealers [Doc. 232-1 at 14], using "individualized solicitations that directly resulted in sales transactions formalized by the dealership." [Doc. 258 at 5].  Plaintiffs were hired in this direct solicitation capacity, Defendant

acknowledges, because car manufacturers like GM are currently prohibited from direct-to-consumer sales in forty-eight (48) states.[15]  [Id. at 5–6].

Plaintiffs' motion for summary judgment paints a different picture of their work as BDMs.  Chiefly, Plaintiffs rebut Defendant's argument that they were exempt outside salespeople because their primary duties were non-exempt promotion work directed toward sales made by another person, as contemplated by 29 C.F.R. § 541.503(a).  [Docs. 247-1 at 15–19; 251 at 5–7].  Plaintiffs make several other arguments as well, such as: BDMs performed highly "routine, repetitive, highly scripted and monitored" work with "relatively little freedom from direct supervision"; used "canned PowerPoints"; obtained leads from Defendant, by no volition of their own; and would deliver a repeatedly recycled presentation to prospective customers before washing their hands of the interaction and allowing the GM dealership to step in and take over to make the sale—all of which were part

---

[15] In its motion for summary judgment, Defendant contends that Plaintiffs' "day-to-day" duties included "finalizing the sale of GM fleets."  [Doc. 232-1 at 11].  The Court finds nothing in Defendant's Statement of Material Facts to support this characterization of Plaintiffs' duties, and Defendant proffers no citation to any evidence following this assertion.  Accordingly, the Court disregards this argument.  See LR 56.1(B)(1), NDGa. ("The Court will not consider any fact: (a) not supported by a citation to evidence . . . (c) stated as an issue or legal conclusion; or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."); see also FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."); cf. Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (en banc) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.").

of an eight (8) step sales process to which Defendant instructed them to adhere to rigidly.  [Doc. 247-1 at 25–29].

The U.S. Supreme Court considered a factually similar situation in Christopher.  567 U.S. 142 (2012).  In that case, the Court considered whether the outside sales exemption applied to a prescription drug company's pharmaceutical representatives whose jobs were to "provide information to physicians about the company's products in hopes of persuading them to write prescriptions for the products in appropriate cases."  Id. at 150.  The pharmaceutical representative role was necessary because pharmaceutical companies (like auto manufacturers) are widely subject to regulations that prevent them from selling directly to consumers. Id.

The Court's description of the pharmaceutical representatives' duties echoes many of the same types of facts disputed in the matter at hand:

> [petitioners] were responsible for calling on physicians in an assigned sales territory to discuss the features, benefits, and risks of an assigned portfolio of respondent's prescription drugs.  Petitioners' primary objective was to obtain a nonbinding commitment from the physician to prescribe those drugs in appropriate cases, and the training that petitioners received underscored the importance of that objective.
>
> Petitioners spent about 40 hours each week in the field calling on physicians.  These visits occurred during normal business hours, from about 8:30 a.m. to 5 p.m.  Outside of normal business hours, petitioners spent an additional 10 to 20 hours each week attending events, reviewing product information, returning phone calls, responding to e-mails, and performing other miscellaneous tasks.  Petitioners were

> not required to punch a clock or report their hours, and they were
> subject to only minimal supervision.

Id. at 151 (footnotes omitted).

As here, the question in <u>Christopher</u> of whether the pharmaceutical representatives actually made a "sale" was heavily disputed, and the pharmaceutical representative employees raised the promotion/sales distinction.  Id. at 164.  The Court found the promotion distinction of little use in determining the "sale" inquiry: "although the promotion-work regulation distinguishes between promotion work that is incidental to an employee's own sales and work that is incidental to sales made by someone else, <u>see</u> § 541.503(a), this distinction tells us nothing about the meaning of 'sale.'"  Id. at 164.  Instead, the Court focused on the "broad catchall phrase" from the definition of a sale in 29 C.F.R. § 541.500(a)(1)(i): "other disposition."  The Court found that limiting the definition of this phrase "to dispositions involving 'contracts for the exchange of goods or services in return for value'" would be too narrow; similarly, the pharmaceutical representatives' proposed definition of "firm agreement or firm commitment to buy" would also be too narrow.  Id. at 163 (internal marks omitted and alteration adopted).

The Court ultimately held the representatives exempt pursuant to the outside sales exemption.

> Given our interpretation of "other disposition," it follows that
> petitioners made sales for purposes of the FLSA and therefore are
> exempt outside salesmen within the meaning of the DOL's regulations.

Obtaining a nonbinding commitment from a physician to prescribe one of respondent's drugs is the most that petitioners were able to do to ensure the eventual disposition of the products that respondent sells. This kind of arrangement, in the unique regulatory environment within which pharmaceutical companies must operate, comfortably falls within the catchall category of "other disposition."

. . . .

Our holding also comports with the apparent purpose of the FLSA's exemption for outside salesmen. The exemption is premised on the belief that exempt employees "typically earned salaries well above the minimum wage" and enjoyed other benefits that "se[t] them apart from the nonexempt workers entitled to overtime pay." Preamble 22124. It was also thought that exempt employees performed a kind of work that "was difficult to standardize to any time frame and could not be easily spread to other workers after 40 hours in a week, making compliance with the overtime provisions difficult and generally precluding the potential job expansion intended by the FLSA's time-and-a-half overtime premium." Ibid. Petitioners—each of whom earned an average of more than $70,000 per year and spent between 10 and 20 hours outside normal business hours each week performing work related to his assigned portfolio of drugs in his assigned sales territory—are hardly the kind of employees that the FLSA was intended to protect.

Id. at 165–66 (footnotes omitted).

Lastly, the Court discarded an argument by the pharmaceutical representatives that Plaintiffs in the instant case have also raised. [See Doc. 251 at 1–2]. The pharmaceutical representatives in Christopher claimed that they were "nonexempt promotional employees who merely stimulate sales made by others[.]" See 567 U.S. at 167; [see also Doc. 251 at 1–2]. In rejecting this argument as made by the pharmaceutical representatives, the Court stated: "[t]his formalistic argument is

30

inconsistent with the realistic approach that the outside salesman exemption is meant to reflect."  Christopher, 567 U.S. at 167.  However, the Court did include the following caveat:

> [the] point is not, as the dissent suggests, that any employee who does the most that he or she is able to do in a particular position to ensure the eventual sale of a product should qualify as an exempt outside salesman. . . . Rather, our point is that, when an entire industry is constrained by law or regulation from selling its products in the ordinary manner, an employee who functions in all relevant respects as an outside salesman should not be excluded from that category based on technicalities.

Id. at 165 n.23 (internal citation omitted).

Based on this authority, the Court finds that Defendant must demonstrate by "clear and affirmative evidence" that the outside sales exemption applies to Plaintiffs' work as BDMs.  See Birdwell, 970 F.2d at 805 (internal citation omitted).  However, as the evidence stands, genuine issues remain regarding several material facts like those on which the Supreme Court based its decision in Christopher.  These issues include, specifically: whether Plaintiffs obtained any kind of commitment, nonbinding or otherwise, from their leads; the scope of product-related topics Plaintiffs were allowed to discuss with their leads; and whether Plaintiffs' efforts only promoted the sales of others (particularly in light of the unique regulatory environment of the auto sales industry).  The Court may not weigh the conflicting evidence presented by the Parties or their credibility upon summary judgment.  Kessler, 545 F. Supp. 2d at 1247 ("In deciding a motion for summary judgment, the

court may not weigh conflicting evidence or weigh the credibility of the parties.")
(citing <u>Hairston v. Gainesville Sun Pub. Co.</u>, 9 F.3d 913, 919 (11th Cir. 1993)).
Additionally, <u>Christopher</u> is distinguishable from the case at bar in that the
employees therein, the pharmaceutical representatives, directly marketed their *own
employer's* products, which cannot be said of Plaintiffs here.  A reasonable jury
could find in favor of either Party.  Accordingly, the Court declines to grant summary
judgment to either Party on the basis of the outside sales exemption.

### b.   The Automobile Sales and Service Exemption

Next, the Parties vehemently argue their opposing positions as to whether
Plaintiffs are exempt from the FLSA overtime pay requirement pursuant to the
automobile sales and service exemption (the "auto sales exemption").  [See Docs.
232-1 at 15–27; 247-1 at 30–34].  The FLSA exempts "any salesman . . . primarily
engaged in selling or servicing automobiles . . . if he is employed by a
nonmanufacturing establishment primarily engaged in the business of selling such
vehicles or implements to ultimate purchasers." 29 U.S.C. § 213(b)(10)(A).

The DOL regulations expound upon the auto sales exemption, providing
specific definitions of qualifying employers and employees.   29 C.F.R.
§ 779.372(b)(1) sets forth the two (2)-part test for qualifying employers. First, "[t]he
establishment must not be engaged in manufacturing;" and second, "[t]he
establishment must be primarily engaged in the business of selling automobiles . . .

to the ultimate purchaser for [29 U.S.C. § 213(b)(10)(A)] to apply." Id. § 779.372(b)(1)(i)–(ii). "Primary engaged" as applied to the employer's business "means that over half of the establishment[']s annual dollar volume of sales made or business done must come from sales of the enumerated vehicles." Id. § 779.372(d).

Next, a qualifying employee must be:

> an employee who is employed for the purpose of and is primarily engaged in making sales or obtaining orders or contracts for sale of the automobiles . . . that the establishment is primarily engaged in selling. . . . Work performed incidental to and in conjunction with the employee's own sales or solicitations, including incidental deliveries and collections, is regarded as within the exemption.

Id. § 779.372(c)(1). "Primary engaged" as applied to the employee's work "means the major part or over 50 percent of the salesman's . . . time must be spent in selling or servicing the enumerated vehicles." Id. § 779.372(d).

In applying the regulatory definitions to the facts of this case, the Court must first address whether Defendant is an establishment whose employees may potentially qualify for the auto sales exemption. The first prong of the test for qualifying employers—that the "establishment must not be engaged in manufacturing"—is not in dispute. Id. § 779.372(b)(1)(i). Rather, the Parties dispute whether Defendant is "primarily engaged in the business of selling automobiles . . . to the ultimate purchaser[.]" Id. § 779.372(b)(1)(ii). It is only where both prongs "are met by an establishment [that] the exemption will be available for salesmen . . . employed by the establishment[.]" Id.

33

Defendant does not argue in its motion for summary judgment that it directly sells automobiles to the ultimate purchaser.  Rather, Defendant concedes that GM dealers execute the sales contracts with the customers solicited by Defendant's BDMs.  [See, e.g., Doc. 232-1 at 26] ("Indeed, BDMs are the driving force behind every step of the sales process until they hand the customer off to the dealer to sign a contract.").  However, Defendant argues that the exemption still applies because Plaintiffs "were an integral part of a larger sales effort that included dealership representatives . . . . While BDMs may not sign the final contract, the vast majority of fleet customers would not be engaging with the dealerships without the sales work of the BDMs." [Doc. 258 at 9].  Defendant stresses that when focusing on the "actual job duties" of Plaintiffs rather than "their title[s] or how they referred to themselves, Plaintiffs were outside salespeople because their primary duties involved the sale of vehicles."  [Id. at 10] (emphasis removed).

In response, Plaintiffs identify evidence that Defendant "does not have the authority to sell GM vehicles directly to the customers."  [Doc. 247-1 at 33] (citing Pls.' Ex. 32—Edward Peper Dep. 135:21–136:6).  Instead, as Plaintiffs point out, Defendant's purchase order agreement with GM "provides that Nexus will be paid for 'professional services' billed monthly."  [Doc. 260 at 10] (citing Pls.' Ex. 14— Nexus/GM Purchase Order Contract at GM 3353-GM 3359).  Plaintiffs also present evidence from the deposition of GM's former Director of Fleet & Government Sales

4cb189a9798aeb8c

demonstrating that Defendant did not sell vehicles to the ultimate customer.  [Id. at

11] (citing Pls.' Ex. 34—Christopher Hoolehan Dep. at 28:6–9) ("Q: 'So Nexus

doesn't sell cars, does it?' . . . A: 'No.'").  Because the Parties do not dispute that

Defendant meets the first prong of the test for qualifying employers—that the

"establishment must not be engaged in manufacturing"—these arguments go to the

second prong, whether Defendant is "primarily engaged in the business of selling

automobiles . . . to the ultimate purchaser[.]"  See 29 C.F.R. § 779.372(b)(1)(i)–(ii).

To support its position, Defendant relies on the U.S. Supreme Court decision

in Encino, 138 S. Ct. 1134 (2018), claiming Encino's "common-sense, functional

approach" to interpreting the "broad reach of the automobile sales exemption" would

hold Plaintiffs exempt because they "are integrally involved in the sales process."

[See Doc. 232-1 at 5–6].  However, Defendant's reliance is misplaced, because in

Encino, there was no question that the service advisors worked for an auto dealership

that sold vehicles to ultimate purchasers. 138 S. Ct. at 1138.  Here, Defendant is not

a dealership and does not sell vehicles to ultimate purchasers.  See Def.'s SOMF ¶ 1

(Nexus provides "automotive management consultancy and business services to

clients in the automotive industry"); see also Hoolehan Dep. at 28:6–9 (Nexus does

not sell vehicles), 142:23–24 ("The only way a customer can buy a vehicle is through

a [GM] dealer.").  Because Defendant does not meet the definition of qualifying

establishment pursuant to 29 C.F.R. § 779.372(b)(1)(ii), Defendant's employees

cannot qualify for this exemption.  Thus, the Court finds that Plaintiffs prevail on this point.

Accordingly, the Court concludes Plaintiffs were not exempt for overtime compensation based on the auto sales exemption and grants Plaintiffs' motion for summary judgment as to this exemption.  In doing so, the Court denies Defendant's motion for summary judgment on this point.

### c.     The Administrative Exemption

Lastly, the Parties dispute whether Plaintiffs are exempt from the FLSA overtime pay requirement pursuant to the administrative exemption.  [See Docs. 232-1 at 15–27; 247-1 at 30–34].  As with the previously addressed exemptions, "[t]he employer carries the burden of proving the [administrative] exemption, and the overtime provisions of the FLSA are narrowly construed against the employer." Bagwell v. Fla. Broadband, LLC, 385 F. Supp. 2d 1316, 1322 (S.D. Fla. 2005) (citing Hogan, 361 F.3d at 625).

The administrative exception to the FLSA involves both a salary and duty component, and applies to "any employee employed in a bona fide . . . administrative . . . capacity[.]"  See 29 U.S.C. § 213(a)(1).  Under the applicable regulations, the term "employee employed in a bona fide administrative capacity" means any employee:

(1) Compensated on a salary or fee basis pursuant to § 541.600 at a rate of not less than $684 per week . . . .[16]

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

In Klim v. DS Services of Am., Inc., 225 F. Supp. 3d 1373 (N.D. Ga. 2015), this Court set forth the relevant standards for assessing an employee's "primary duty" in the context of the FLSA's administrative exception.

> Whether an employee falls under the administrative exemption is a highly fact-intensive inquiry that depends on the particular circumstances of each case. See 29 C.F.R. § 541.700(a) (providing that the "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole"); . . . . As a job title is of little use for exemption purposes, courts look to the tests articulated by the Department of Labor's ("DOL") regulations under the FLSA in assessing the applicability of the FLSA's statutory exemptions. [Morgan v. Fam. Dollar Stores, Inc., 551 F.3d 1233, 1265–66 (11th Cir. 2008)].

> The regulations define the term "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Factors to consider when determining the primary duty

---

[16] 29 C.F.R. § 541.600(b) provides: "The required amount of compensation per week may be translated into equivalent amounts for periods longer than one (1) week. For example, the $684-per-week requirement will be met if the employee is compensated biweekly on a salary basis of not less than $1,368, semimonthly on a salary basis of not less than $1,482, or monthly on a salary basis of not less than $2,964." Thus, the minimum yearly salary requirement for the administrative exception translates to $35,568 per year. Id. As explained below, the Parties do not dispute that Plaintiffs' base salary exceeds the minimum requirement for this exception. See n.17, infra.

of an employee include (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.  Id.  While the amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee, it is not dispositive of the primary duty issue.  See 29 C.F.R. § 541.700(b) (noting that "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement" and that "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion").

Id. at 1377–78.

As noted above, an employee only qualifies for the administrative exception where her primary duty involves both "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and "the exercise of discretion and independent judgment with respect to matters of significance."   29 C.F.R. § 541.200(a)(2)–(3).   Regarding the first prong of the administrative exception primary duty test:

[t]o qualify as work "directly related to the management or general business operations" an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment. 29 C.F.R. § 541.201(a).  A primary duty "directly related to the management or general business operations" includes work in a functional area of the business, such as accounting, budgeting, auditing,

quality control, purchasing, procurement, marketing, safety and health, personnel management, and similar activities.  Id. at § 541.201(b).

Klim, 225 F. Supp. 3d at 1378.

As for the second prong of the test, the DOL regulations provide that generally,  "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202(a).  An exempt employee must be able to exercise her discretion and independent judgment regarding "matters of significance[,]" which "refers to the level of importance or consequence of the work performed."  Id.  Factors for the Court to consider when determining whether the "discretion and independent judgment" prong is satisfied include, but are not limited to:

- whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;

- whether the employee carries out major assignments in conducting the operations of the business;

- whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;

- whether the employee has authority to commit the employer in matters that have significant financial impact;

- whether the employee has authority to waive or deviate from established policies and procedures without prior approval;

- whether the employee has authority to negotiate and bind the company on significant matters;

- whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives;

- whether the employee investigates and resolves matters of significance on behalf of management; and

- whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

Id. § 541.202(b).

> Although the "exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision . . . employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review . . . [.] The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.202(c). The regulations further provide that the "exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." Id. at § 541.202(e).

Klim, 225 F. Supp. 3d at 1379.

Turning now to the arguments, the Parties do not appear to dispute Plaintiffs' annual base salary was between $70,000 and $75,000 per year, in excess of the

minimum required for the administrative exception.[17] [See Doc. 232-1 at 3]; see also Def.'s SOMF ¶ 19.[18]  Instead, the Parties strongly dispute the nature of Plaintiffs' primary duties when they worked as BDMs for Defendant.  Thus, their arguments address the second and third prongs of 29 C.F.R. § 541.200(a).  Defendant, as the employer, bears the burden of proving both prongs are satisfied for Plaintiffs to be exempt pursuant to the administrative exception.  Accord Bagwell, 385 F. Supp. 2d at 1322.  The Court addresses the Parties' arguments regarding the "primary duty" prongs of the administrative exception in turn.

i.      29 C.F.R. § 541.200(a)(2)

First, the Parties dispute whether Plaintiffs' primary duty during their employ as BDMs involved "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers."  See 29 C.F.R. § 541.200(a)(2).  Defendant contends Plaintiffs' primary duty as BDMs was "to generate revenue for GM by leading to the close of the sale"

---

[17] Plaintiffs' Statement of Material Facts does not contain a statement of their annual salary, only an assertion that "[a]t no point did any Plaintiff in this matter earn $100,000.00 or more in any twelve [12] month period."  Pls.' SOMF ¶ 50.  But in their response to Defendant's Statement of Material Facts, Plaintiffs do not dispute (or even address) Defendant's statement that "BDMs earn a base salary of between $70,000 and $75,000 annually."  Def.'s SOMF ¶ 19.  Thus, the Court deems this fact undisputed.

[18] As earlier discussed, Defendant has voluntarily withdrawn its references to the expert report of Robert Stanton [Doc. 232-33] from their Statement of Material Facts and Motion for Summary Judgment.  [See Doc. 288].  Mr. Stanton's expert report is just one of several exhibits cited in support of Defendant's undisputed statement that Plaintiffs and other BDMs earned a base salary between $70,000–$75,000.  The Court disregards this citation.  Defendant cites several other pieces of evidence in support of the salary estimate, which the Court finds sufficient for purposes of resolving the Parties' cross-motions for summary judgment.  See Def.'s SOMF ¶ 19.

or, alternatively, "to influence customers to purchase GM vehicles[.]" [Doc. 232-1 at 29]. Defendant claims this duty directly relates to the operation of its business because "Nexus' revenue comes almost exclusively from the work it does for GM through Operation Conquest." [Id.][19]

Plaintiffs, on the other hand, contend that their primary duties as BDMs were "cold calling, qualifying leads, setting appointments, preparing canned PowerPoints, [and] initial fact[-]finding meetings" in order to "get leads for [GM] dealerships." [Doc. 247-1]. Plaintiffs claim that these duties render them non-exempt because they were "production" employees rather than administrative employees. [See Docs. 247-1 at 26–27; 251 at 14–16]. Alternatively, Plaintiffs assert they were not exempt employees because they had no "hand in running the business" but were only "the worker bees of Operation Conquest." [See Docs. 247-1 at 27; 251 at 16].

The Court first addresses Plaintiffs' primary argument on this point—that as BDMs, they were production employees rather than administrative employees. Plaintiffs state that "BDMs are Nexus' marketplace offerings" and "BDMs are the primary product offering of Nexus." [Doc. 251 at 14, 16]. As support, Plaintiffs

---

[19] Defendant also points to evidence that one (1) opt-in Plaintiff, Meghan Wilson, worked on "extensive long-term marketing and promotional strategies" and "collaborated with corporate officials" to create and implement "business and marketing plans." [Doc. 232-1 at 29]. However, Plaintiff Wilson's deposition testimony states that she did not draft any of these materials herself; instead, the language was crafted by Gianni Lalos, a former manager at Nexus "or" GM, and distributed to BDMs via email to put in their LinkedIn profiles. See Def.'s Ex. P—Meghan Wilson Dep. at 22:6–23:15.

point to the purchase order between Nexus and GM, wherein Nexus states it will provide "personnel in a bundled service as Business Development Managers (BDM) and Area Sales Managers (ASM)."  [Doc. 247-1 at 27].  Essentially, Plaintiffs attempt to characterize or themselves as "production employees" because they were "products."  However, the Court disagrees.

The DOL regulations differentiate "work directly related to assisting with the running or servicing of the business, as distinguished from, for example, working on a manufacturing production line," and thus, the Court finds Plaintiffs' argument on this point unpersuasive.  See 29 C.F.R. § 541.201(a); see also Hogan, 361 F.3d at 627 (holding that insurance salesmen were not production employees because "[t]heir duties included promoting sales, advising customers, adapting policies to customer's needs, . . . . These duties are similar to administrative, rather than production, tasks").  Plaintiffs offer no binding authority to support their "production employees" argument, and all the cases cited in their briefs are factually distinguishable from this case.

Separately, Plaintiffs contend that the production/administration dichotomy separates them from those exempt employees who "engage[] in running the business itself or determining its overall course or policies," because they were only involved with "the day-to-day carrying out of the business' affairs."  [Doc. 274-1 at 27] (quoting Talbott v. Lakeview Ctr., Inc., 3:06CV378/MCR/MD, 2008 WL 4525012,

at *4 (N.D. Fla. Sept. 30, 2008)).  The Court also finds this argument unavailing. Plaintiffs' own characterization of their role supports a finding that their primary duties directly related to the general business operations of Defendant because they worked in a functional area of the business.  See 29 C.F.R § 541.201(b).

For instance, the applicable regulation expressly contemplates "marketing" roles as within the scope of the administrative exemption.  Id.  As BDMs, Plaintiffs (at the very least) solicited customers for their employer's main client and marketed that main client's brand.  See Pls.' SOMF ¶ 9 ("[The] BDMs' primary job functions are to promote GM's Brand, work as 'brand ambassadors[,]' and develop qualified leads for the independently owned GM dealerships[.]") (citations omitted); id. ¶ 24 ("BDMs['] role is to serve as a brand ambassador[.]");  id. ¶ 39 ("GM is [Defendant's] only client in the U.S.; thus all of [Defendant's] revenue is derived from the per-head staffing of BDMs . . . related to Operation Conquest[.]").  This district has held that where an employee is not subject to constant, direct supervision and "play[s] a crucial role in generating revenue for the defendant . . . her duties [are] therefore directly related to the [defendant's] general operations.  Cue-Lipin v. Callanwolde Found., Inc., 1 F. Supp. 3d 1359, 1361 (N.D. Ga. 2014).

Defendant additionally carries its burden as the employer to prove this prong of the exemption through clear and affirmative evidence.  See Birdwell, 970 F.2d at 805.  Defendant acknowledges, and Plaintiffs do not dispute, that its "revenue comes

almost exclusively from the work it does for GM through Operation Conquest" and that "goal of Operation Conquest is to increase GM sales."  [Doc. 232-1 at 29].  Defendant points to deposition testimony from certain opt-in Plaintiffs who said they "promoted sales" on behalf of GM and "influenced customers' decisions to purchase GM vehicles."  [Id.] (citing exhibits).  Considering "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole," see Reyes v. Goya Foods, Inc., 549 F. App'x 876, 877 (11th Cir. 2013), and in light of the evidence, the Court finds Plaintiffs performed "office or non-manual work directly related to the . . . general business operations of the employer or the employer's customers."  See 29 C.F.R. § 541.200(a)(2).

Accordingly, the Court finds this prong of the administrative exemption to be satisfied.  The Court next addresses the "independent judgment and discretion" prong of the exemption.

ii.      29 C.F.R. § 541.200(a)(3)

Regarding the final prong of the administrative exemption, the Parties dispute whether Plaintiffs' primary duty as BDMs "include[d] the exercise of discretion and independent judgment with respect to matters of significance."  See id. § 541.200(a)(3).  As noted above, the "regulations further provide that the 'exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in

45

manuals or other sources.'"  <u>Klim</u>, 225 F. Supp. 3d at 1379 (quoting 29 C.F.R.

§ 541.202(e)).

The Parties provide different accounts of the level of discretion and

independent judgment Plaintiffs exercised in performing their duties as BDMs.

[<u>E.g.</u>, Docs. 232-1 at 30; 247-1 at 26].  But even construing the facts in the light most

favorable to Plaintiffs, the evidence supports a finding that Plaintiffs exercised their

discretion and independent judgment within the meaning of the administrative

exception.  By their own account, Plaintiffs had a hand in choosing which leads to

develop, performed customized research before meeting with selected leads, and

delivered presentations that necessarily required some amount of customization to

each lead.  Pls.' SOMF ¶ 57 ("BDMs are supposed to select companies within select

industries known to purchase fleet vehicles to prioritize them from their list of

leads.") (internal citation omitted); <u>id.</u> ¶ 63 ("BDMs are taught how to conduct

research on the business, the industry and given certain questions to ask the business

about how they manage their vehicles.") (internal citation omitted); <u>id.</u> ¶ 64 (BDMs

do "additional research on the business, industry and the person they will be

meeting[.]") (internal citation omitted); <u>id.</u> ¶ 89 (BDMs try to "convince a prospect

to meet with a dealer, or attend a presentation with a dealer[.]") (internal citation

omitted).  The Court finds that these facts, as alleged by Plaintiff, fall in squarely

line with the reasoning that "[a]n employee exercises discretion when he compares

46

and evaluates possible courses of conduct and acts after considering the various possibilities.  The fact that his decision or action is subject to review by management is not dispositive."  Coppage v. Bradshaw, 665 F. Supp. 2d 1361, 1367 (N.D. Ga. 2009) (citing 29 C.F.R. § 541.202).

Additionally, Defendant carries its burden as the employer to prove the exemption through clear and affirmative evidence.  See Birdwell, 970 F.2d at 805. For example, Defendant points to the BDM Fleet Training Guide, which mentions at several points that a BDM must use her discretion to tailor her approach for different prospects.  [See Doc. 238 at 21, 30, 32] (the BDM Fleet Training Guide instructs BDMs, among other things, to figure out how to "account for vehicle equipment differences to compare" total cost of ownership between the vehicles the prospect currently uses for its fleet versus a GM vehicle fleet; to "decide for yourself and for each presentation . . ." the most effective approach; to "identify the scope" of a prospect's needs; and to "identify the competitive landscape" in a particularized context).   Although Plaintiffs utilized certain "well-established techniques, procedures or specific standards described in manuals or other sources" in performing their presentations and pursuing potential leads, see 29 C.F.R. § 541.202(e), such as the eight (8) step sales process described by Plaintiffs [see Doc. 247-1 at 27], Defendant presents evidence that BDMs would choose to sometimes go "out of order" based on what was best for each prospective lead and

47

that BDMs understood they had to "elicit the specific needs and challenges of the customer to deliver a meaningful solution" tailored to each lead's "particular needs." [Doc. 232-1 at 32] (citing exhibits).  Considering "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole," see Reyes, 549 F. App'x at 877, and in light of the evidence, the Court finds Plaintiffs' primary duties "include[d] the exercise of discretion and independent judgment with respect to matters of significance."  See 29 C.F.R. § 541.200(a)(3).  Thus, the Court finds this final prong of the administrative exemption to be satisfied.

Because the Parties do not dispute the first prong of the administrative exemption pursuant to Section 541.200(a), and Defendant has demonstrated the applicability of the second and third prongs, the Court finds Plaintiffs exempt from the FLSA's overtime compensation requirement based on this exemption. Accordingly, the Court grants Defendant's motion for summary judgment as to this point.  In doing so, the Court denies Plaintiffs' motion for summary judgment as to the same.

## V.    Summary

In sum, the Court grants in part and denies in part both Parties' motions for summary judgment.  Specifically, the Court denies Plaintiffs' motion with regards to the outside sales exemption and the administrative exemption.  The Court grants Plaintiffs' motion as to their argument that they worked overtime hours and as the

auto sales exemption.  The Court denies Defendant's motion with regards to its argument that Plaintiffs fail to demonstrate they worked overtime hours, the outside sales exemption, and the auto sales exemption.

However, the Court grants Defendant's motion as to the administrative exemption.  "[A]n employer can avoid paying overtime compensation if it proves that [just] one of the FLSA's exemptions applies." Kessler, 545 F. Supp. 2d at 1246 (citing Wouters, 9 F.3d at 929); see also 29 U.S.C. § 213.  Therefore, the administrative exemption forecloses Plaintiffs' claims for unpaid overtime.[20]

## VI.   Conclusion

For the reasons set forth above, the Court **DENIES AS MOOT** Plaintiffs' first Motion for Summary Judgment.  [Doc. 233].  The Court **DENIES** Plaintiffs' "Motion for Leave of Court to File Supplemental Evidence in Support of Plaintiffs' Motion for Summary Judgment and Request for Leave to File Supplemental Brief in Opposition to Defendant's Motion for Summary Judgment and Support of Plaintiffs' Motion for Summary Judgment."  [Doc. 287].  The Court also **DENIES** Defendant's Motion for Oral Argument regarding Plaintiffs' motion for leave. [Doc. 291].

---

[20] In light of this ruling, the Court denies as moot Plaintiffs' "Motion *in Limine* to Exclude the Defendant's Use of Half Time 29 [C.F.R.] § 778.114, or Use of Fluctuating Workweek Method (FWW) to Determine Damages."  [Doc. 297].

Additionally, the Court **GRANTS** Plaintiffs' Motions to Seal.  [Docs. 234, 252].  Accordingly, the Court **DIRECTS** the Clerk to **SEAL** Exhibits One (1) through Sixty-Four (64) attached to Plaintiffs' first Motion for Summary Judgment [Doc. 233] as well as Exhibits Sixty-Five (65) through Sixty-Nine (69) attached to Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment. [Doc. 251].

Lastly, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Amended Motion for Summary Judgment [Doc. 247] and **DENIES AS MOOT** Plaintiffs' "Motion *in Limine* to Exclude the Defendant's Use of Half Time 29 [C.F.R.] § 778.114, or Use of Fluctuating Workweek Method (FWW) to Determine Damages." [Doc. 297].  The Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment.  [Doc. 232].  The Court **DIRECTS** the Clerk to **ENTER JUDGMENT** in favor of Defendant and **CLOSE** this case.

**SO ORDERED**, this 18th day of September, 2020.

Eleanor L. Ross
United States District Judge
Northern District of Georgia